# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

No. FAR _____

COMMONWEALTH

v.

JOSÉ RAMIREZ

ON APPEAL FROM A JUDGMENT
OF THE HAMPDEN COUNTY SUPERIOR COURT

APPELLANT'S APPLICATION
FOR FURTHER APPELLATE REVIEW

Wendy Sibbison, Esq.
Attorney for José Ramirez
26 Beech Street
Greenfield, MA 01301
(413) 772-0329
BBO # 461080

June 29, 2002

## REQUEST FOR LEAVE TO OBTAIN
## FURTHER APPELLATE REVIEW

José Ramirez respectfully asks this Court for leave to obtain further appellate review of his conviction in Hampden Superior Court for cocaine trafficking.

## STATEMENT OF PRIOR PROCEEDINGS

In August, 1998, a Hampden County grand jury indicted Mr. Ramirez for trafficking in 200 or more grams of cocaine, M.G.L. c. 94C, § 32E(b)(4). The Superior Court (Sweeney, J.) denied a pre-trial motion to suppress. In December, 1998, a jury found him guilty of the offense and in March, 1999, the trial judge (McDonald, J.) denied the motion and imposed the mandatory minimum sentence. Mr. Ramirez filed a timely appeal. On June 14, 2002, the Appeals Court affirmed the conviction, finding that hearsay was unlawfully admitted but "not prejudicial error." A copy of the slip opinion is attached.[1]

---

[1]The opinion is taken from the Social Law Library website; the Appeals Court did not issue a hard copy.

1

## FACTS RELEVANT TO THE APPEAL

The hearsay evidence--printed material found in
Mr. Ramirez's wallet offered to prove his connection to
New York--did, as the Appeals Court acknowledges,
corroborate the testimony of Danny Rodriguez, the man
who sold the drugs to an undercover officer.   The
Appeals Court is wrong, however, to suggest that this
is the only purpose served by the hearsay and also
wrong in stating that "there was a significant body of
other evidence corroborative of Rodriquez's
credibility, on matters more central to the elements of
the charged offense."

The Commonwealth's expert police witnesses--who
observed the entire transaction by Rodriquez and all
related actions by Ramirez--agreed that Ramirez
exhibited no suspicious conduct.

During Rodriquez's first visit to the apartment
complex, when Ramirez stayed in the parking lot, Lt.
Jebb carefully watched their body language and at no
time saw either hand anything to the other or any
suspicious exchange between the two.

2

On the day of the sale, when Ramirez drove Rodriguez to the complex and waited downstairs, the officer again observed nothing suspicious between the two. He saw nothing exchange hands, no secretive movements, or any other signs that, to a trained eye, suggested a drug sale in progress. Ramirez also made no effort to "check out the parking lot" as would be expected if he were there to protect Rodriguez and the product. Throughout the transaction upstairs, Ramirez was in the lobby, "just sitting there doing nothing." Not once did he step outside or come to the window to look around. Police agreed that there was "absolutely no observation of Mr. Ramirez acting as a lookout" and that **"none of [the observable] criteria of two people working together were present in this case."**

There was no evidence that anyone other than Mr. Rodriguez had touched the Macy's bag, the cocaine inside it, or the scale he produced, nor did any other forensic evidence connect Ramirez with this transaction. There was no evidence that police found

3

anything drug-related or otherwise incriminating in the
Toyota driven by Ramirez.

As soon as Officer Fisher radioed from upstairs
that he had consummated his deal with Rodriquez, Lt.
Jebb ran inside to where Ramirez sat near the elevator.
Although the officer came right at him, Ramirez did not
jump up or make any effort to leave.  He was unarmed.

When asked his name, Ramirez--a non-citizen with
immigration problems--said, "George Lassu."[2]  A search
of his person yielded keys to the Toyota--registered in
Massachusetts to George Lassu--a beeper, and a wallet
containing $513 in cash.  The wallet also contained a
Massachusetts driver's licence and a New York City
health club receipt, both in George Lassu's name, and a
number of business cards, many of which bore New York
City addresses.

This "New York" evidence was not, as the Appeals
Court asserts, merely "corroborative of Rodriquez's
credibility."  It strongly supported the key issue in
the case: whether Ramirez had anything to do with the

_____

[2]The Superior Court's ruling that this answer was
admissible is discussed in Section II, _infra_.

4

drugs sold by Rodriquez.  Officer Fisher testified as an expert witness that cocaine sold in Chicopee comes from "the outskirts.  Usually come from Hartford, normally from New York."  Also testifying as an expert, Lt. Jebb stated that most of the drugs distributed in the Chicopee area are "coming out of New York City."

Aside from the New York hearsay evidence, the only inculpatory evidence outside of Rodriguez's testimony was that Mr. Ramirez, when arrested, gave a false name and carried a beeper.  The other evidence emphasized by the Appeals Court was Rodriguez's telling the undercover officer that the guy waiting outside is "the main man," admitted solely as a prior consistent statement and not for the truth.  But "main man" also has an innocent, colloquial meaning.  Merriam-Webster's Collegiate Dictionary (10th ed. 2001) ("main man, noun: 1: best male friend"), The American Heritage Dictionary of the English Language (4th ed. 2000) (main man, noun: 1.a. A man who is important or influential in one's life.  b. One's best male friend.")

5

Although Rodriguez identified Ramirez as his drug supplier for the past six months, he admitted that this was the first time he had not used his own car to make a sale; this time he "needed a ride." Rodriguez also admitted that, other than this time, "every time he sold drugs, he picked them up at this friend's house in Springfield." He pretended that he couldn't remember where the friend lived. He admitted that he was "scared that if [he] give[s] that friend's name harm could come to [him] or [his] family." He denied that the "friend" had ever supplied him with drugs and insisted that Ramirez was his supplier.

The theory of the defense was that Rodriguez falsely implicated Ramirez to save himself from a mandatory jail sentence while also protecting himself and his family from the danger of identifying his real supplier. Rodriguez--English-speaking, college-educated, and married to an American citizen--needed a ride and so hired Ramirez to drive him. He admitted that he regularly hired locals who spoke little English to rake his leaves and clean up his yard. Ramirez--a

6

non-citizen with immigration problems who did not speak
English and whom Rodriguez knew "from the street"--was
an easy, safe choice to falsely implicate.

### POINTS FOR FURTHER APPELLATE REVIEW

1.  Did the Appeals Court apply the wrong standard of
    review in ruling that the use of unlawful hearsay
    to obtain a criminal conviction, preserved below,
    was harmless?

2.  Where, after arresting the defendant and before
    giving him his <u>Miranda</u> rights, police asked him
    his name knowing he was likely to falsely identify
    himself, should his answer have been suppressed?

### REASONS WHY FURTHER APPELLATE REVIEW IS APPROPRIATE

**I.  THE APPEALS COURT DECISION SETS A DANGEROUS
PRECEDENT FOR THE REVIEW OF CONVICTIONS GROUNDED IN
PART ON UNLAWFUL HEARSAY.**

> A.  <u>The "New York" Hearsay Was Used In Two Ways:
> to Connect Ramirez With The Geographic Source of
> the Drugs and to Bolster Rodriguez' Credibility</u>.

During the Commonwealth's case in chief, police
witnesses testified that New York was a main source of
the drugs distributed in Chicopee.

When the Commonwealth offered the contents of Mr.
Ramirez's wallet into evidence, defense counsel
objected, urging that all the documents purporting to
be from New York, including business cards, were

7

hearsay.  The prosecutor asserted that "the contents of the wallet come in for the nonhearsay purpose of just showing that the defendant had these items on him and **that he does have a connection with New York.**"  The judge agreed with the prosecutor:

> . . . I think that testimony has gone in about New York being the source.  I don't think that the fact that there may be some testimony that links him . . . to New York is inadmissible because of that. . . . I don't see a basis to keep it out because of the fact that he was carrying a wallet with New York papers.

Outside the jury's hearing, the judge ruled that the jury could decide whether the cards have "any probative value of [Ramirez's] place of origin."  They came in without limitation, over a renewed objection.

Accordingly, the Appeals Court unfairly minimized the import of the "New York" hearsay evidence.  It did not simply corroborate Rodriguez's testimony that, when he wanted drugs, he called Ramirez in New York.  It separately allowed the jury, based on expert police testimony, to infer that the particular drugs distributed here came from New York and that Ramirez, from New York, was the supplier.

In order to draw any inference about Mr. Ramirez's "place of origin" from the cards, they had to believe that printed "place" information--New York addresses and telephone numbers--was the truth. Each card contained at least double level hearsay about "place": a statement of the person who typeset the printing, based on a statement of the person who gave the typesetter this information. See, e.g., <u>United States v. Vigneau</u>, 187 F.3d 70, 74-77 (1st Cir. 1999) (reversible error to admit double hearsay on Western Union forms to prove that defendant was sender of money); <u>United States v. Patrick</u>, 959 F.2d 991, 1000-1003 (D.C. Cir. 1992) (reversible error to admit double hearsay on receipt used to prove defendant's address).

> B.  <u>The Prosecutor Relied On the "New York" Hearsay In Her Closing to Connect Ramirez With The Geographic Source of the Drugs and to Bolster Rodriguez' Credibility.</u>

In her closing, reminding the jury of the evidence that **"most of the drugs in [the Chicopee] area come from New York,"** the prosecutor used the New York theme as her *first reason* why the jury should "believe Danny Rodriguez." Rodriguez, she urged, "told you that the

9

defendant was his supplier, that he came from New

York." As evidence that this was true, she pointed to

Ramirez' wallet and the "many cards that connect him to

New York." She also relied on the health club receipt:

> And **the defense doesn't want him connected to New**
> **York because New York is the source of the drugs,**
> and if he has a connection to New York, that gives
> Danny Rodriguez's testimony credibility.
>
> And I ask you to look at this yellow receipt in
> there--George Lassu; it's a membership to a health
> club in New York City.

As with the business cards, the health club

receipt was inadmissible hearsay that Ramirez joined

and used a New York health club.

    C. <u>The Errors Were Not Harmless Beyond a</u>
<u>Reasonable Doubt</u>.

Since the Commonwealth's primary argument

supporting "Danny Rodriguez's . . . credibility"--the

principal issue at trial--was based on inadmissible

hearsay, the error was not harmless beyond a reasonable

doubt. <u>Commonwealth v. Seminara</u>, 20 Mass. App. Ct.

789, 796-798 (1985); <u>Schneble v. Florida</u>, 405 U.S. 427,

432 (1982); U.S. Const., am. 6, 14; Mass. Decl. of

Rts., art. 12. Where, as here, a hearsay objection is

preserved, the First Circuit has observed that "doubts are properly resolved in favor of a defendant." United States v. Vigneau, 187 F.2d 82, 87 (1st Cir. 1999).

Understating the import of this evidence to the Commonwealth's case--as the prosecutor tried it--and overstating that case's strength, the Appeals Court then affirmed  based on a general standard of "prejudicial error."  It did not state what the non-constitutional standard is in Massachusetts:[3]

> An error is nonprejudicial only 'if . . . the conviction is sure that the error did not influence the jury, or had but very slight effect . . . .  But if one cannot say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

Commonwealth v. Esteves, 429 Mass. 636, 639 (1999) (quoting cases).

Here, as in Esteves, the central issue at trial was the credibility of a single witness, the prosecutor relied in closing on hearsay evidence bolstering his

---

[3]Commonwealth v. Esteves, 429 Mass. 636, 639 n.4 (1999) (not reaching constitutionally-based hearsay standard because reversing on ordinary standard).

11

main witness, and the hearsay went to a key factual
question.  (In this case, the question was whether
Ramirez and the drugs came from the same geographic
location; in Esteves, the question was whether a rape
complainant had sex with her boyfriend.)  Since in both
cases the "inadmissible hearsay was 'cumulative' of the
[key Commonwealth] witness's own testimony," 429 Mass.
at 640, the Appeals Court should have ruled here that
it could not "fairly say that, [in considering the
[credibility of the witness], the jurors primarily
relied on properly admitted evidence to make their
decision."  Id., quoting Commonwealth v. Cyr, 425 Mass.
89, 95 (1997).  Since the only independent evidence
that Ramirez came from New York was hearsay, its
improper admission obviously "weakened the defendant's
case in some significant way . . . ."  425 Mass. at 95.

**II. BECAUSE POLICE KNEW THAT RAMIREZ WAS REASONABLY
LIKELY TO GIVE A FALSE NAME, THEY WERE REQUIRED TO GIVE
MIRANDA WARNINGS BEFORE ASKING HIS NAME.**

Miranda warnings are required before police engage
in "any words or actions . . . (other than those
normally attendant to arrest and custody) that the

12

police should know are reasonably likely to elicit an incriminating response from the defendant." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980). "In this context, an 'incriminating response' includes any response, inculpatory or exculpatory, which the prosecution might seek to use against the suspect at trial." <u>Commonwealth v. Torres</u>, 424 Mass. 792, 796-797 (1977), citing <u>Innis</u>, <u>supra</u>, at 301 n.5.

The motion judge correctly noted that giving a false name is evidence of consciousness of guilt which the prosecution was likely to seek to introduce. It is thus, by definition, an "incriminating response."

The judge mistakenly ruled that, although under arrest, Ramirez's response was admissible under the so-called "booking exception" to the Miranda/Innis rule. Under the exception, warnings are not required for questions about "biographical data necessary to complete booking or pretrial services"--including the defendant's name--which are "requested for record-keeping purposes only" and therefore "appear reasonably

13

related to the police's administrative concerns."

Pennsylvania v. Muniz, 496 U.S. 582, 601-602 (1990).

Both the United States Supreme Court and this

Court have made clear, however, that

> recognizing a "booking exception" to Miranda does
> not mean . . . that any question asked during the
> booking process falls within that exception.
> Without obtaining a waiver of the suspect's
> Miranda rights, the police may not ask questions,
> even during booking, that are designed to elicit
> incriminatory admissions.

Id. at 602 n. 14; Commonwealth v. Sheriff, 425 Mass.

186, 198-199 and n. 12 (1997).[4]

Here, the Commonwealth failed to satisfy its heavy

burden to prove beyond a reasonable doubt[5] that the

question to Ramirez, "What is your name," was not

---

[4]Those courts which restrict the "booking
exception" to the booking process itself apply the same
Innis test to other basic questions alleged to be
administrative rather than investigatory in nature.
See, e.g., Sheriff, supra; 2 W. LaFave et al., Criminal
Procedure § 6.7(b), at 550-551 & cases cited at nn.44-
45 (1999 and Supp. 2001).

[5]See, Commonwealth v. Day, 387 Mass. 915, 921-921
(1983), Miranda v. Arizona, 384 U.S. 436, 475-476
(1966) (state and federal burden to prove Miranda
waiver), and Commonwealth v. Rubio, 27 Mass. App. Ct.
506, 512 (1989) (assuming Commonwealth had burden to
prove Miranda "booking exception").

"designed to elicit [an] incriminatory admission."

<u>Sheriff</u>, <u>supra</u>; <u>Muniz</u>, <u>supra</u>, at 602 n. 14.

The Appeals Court improperly made light of the officers' agreement that, when they arrested Ramirez, they knew he had given a false name when they arrested him on a different occasion *and that they conferred with each other before asking him his name.*

Lt. Jebb testified:

The minute I saw him [inside the building], I quickly remembered where I had encountered him before. I remembered that it was funny because they were Dominicans, and they had given us fake names on McKinstry Avenue, like Anderson or some Caucasian name that struck me funny, and it turned out to be José Pematol and Richard Anderson--**I mean José Ramirez.**

Sgt. Dakin also recalled both Ramirez' real name and the false name he had used before. He conceded that, when they asked the defendant "what his name was," they already "knew who he was . . . ." Had Sgt. Dakin not known this real name, he would hardly have accused him of lying when he gave a different one, nor would he have gone directly to the police records of "José Ramirez" in order to confront him with his photo.

15

Under comparable circumstances,[6] the Wisconsin Supreme Court declined to "extend the [booking] exception to incriminating questions asked at the time of arrest." State v. Stevens, 511 N.W.2d 591, 599 (Wis. 1994), cert. denied, 515 U.S. 1102 (1995). A further reason was that, "while it [was] impossible to determine the officer's intent from the record," it appeared that the questions "may have been intended to elicit incriminating responses." Id.

> supposed identification questions which would otherwise be innocuous . . . constitute[d] interrogation under Innis because the circumstances of the particular case gave the officer reason to know that the suspect's answer would likely incriminate him.

2 W. LaFave et al., Criminal Procedure § 6.7(b), at 551 & n.45 (1999 & Supp. 2001), citing cases.

Within seconds, Ramirez was grabbed and handcuffed, then asked his name by officers who knew that he had given a false name under similar

---

[6]In the Wisconsin case, the defendant, arrested where drugs and guns were found, was asked his name and whether he lived there. He "initially gave his name as Zeke, but then stated (accurately) that he was Bruce Stevens [and] admitted that he lived in the house."

16

circumstances in the past and who had conferred before asking him his name. This scenario is not comparable to the neutral setting and information-gathering of booking procedures. Instead, it is one where the suspect was reasonably likely to give a false name again. Accordingly, the question "amounted to an interrogation requiring Miranda warnings."
<u>Commonwealth v. Sheriff</u>, 425 Mass. 186, 198 (1997).

Because important principles of constitutional and evidentiary law are at the heart of this case--almost exclusively based on the testimony of a cooperating witness caught red-handed in a drug sting--further appellate review is in the interests of justice.

Respectfully submitted,
JOSÉ RAMIREZ,
By his attorney,

Wendy Sibbison, Esq.
26 Beech Street
Greenfield, MA 01301-2308
(413) 772-0329
BBO # 461080

17

COMMONWEALTH vs. JOSE RAMIREZ Case 1:03-cv-40291-FDS Document 10-2 Filed 03/16/2004 Page 20 of 22

Page 1 of 3

**APPEALS COURT SLIP OPINIONS**

a service of the Social Law Library  Back 

| | |
|---|---|
| Docket No.: | 00-P-1754 |
| Parties: | COMMONWEALTH vs. JOSE RAMIREZ. |
| County: | Hampden. |
| Dates: | February 6, 2002. - June 14, 2002. |
| Present: | Porada, Lenk, & Green, JJ. |

Arrest. Constitutional Law, Arrest, Admissions and confessions. Evidence, Admissions and confessions, Hearsay, Cumulative evidence. Practice, Criminal, Argument by prosecutor. Joint Enterprise.

Indictment found and returned in the Superior Court Department on August 26, 1998.

A pretrial motion to suppress evidence was heard by Constance M. Sweeney, J.; the case was tried before C. Brian McDonald, J., and a motion for a new trial was heard by him.

Wendy H. Sibbison for the defendant.

Marcia B. Julian, Assistant District Attorney, for the Commonwealth.

GREEN, J. The defendant appeals from his conviction for trafficking in cocaine as a joint venturer (and the subsequent denial of his motion for a new trial), claiming as errors (i) the denial of his motion to suppress his statement to the police, i.e., giving them a false name, before he had received Miranda warnings; (ii) the admission in evidence of various business cards and other material containing hearsay information; (iii) improper closing argument by the Commonwealth; (iv) insufficiency of the evidence to support his conviction as a joint venturer; and (v) the lack of a specific unanimity instruction. Though we agree that the business cards should not have been allowed in evidence, we conclude that the error was not prejudicial. Since we find no merit in the defendant's other claims of error, we affirm the conviction and the order denying the motion for a new trial.

We summarize the facts that the jury could have found, supplementing the summary as necessary incident to our discussion of each of the defendant's claims.

On May 14, 1998, acting on a tip from an informant, undercover police officers completed a controlled purchase of cocaine from Daniel Rodriguez. By prior arrangement, Rodriguez brought a sample of the drug to an apartment occupied by one of the officers for the officer's inspection. Rodriguez then left the apartment and, after the officer later communicated his desire to proceed with the purchase, returned with eleven ounces of cocaine. The officer delivered $10,000 to Rodriguez, which Rodriguez divided, placing $2,000 in his wallet and $8,000 in his pocket. As Rodriguez left the apartment, the officer radioed other police officers to advise them that the sale was complete; Rodriguez was arrested in the corridor outside the apartment.

On both of Rodriguez's visits to the apartment, he arrived in a tan Toyota automobile driven by the defendant. After dropping Rodriguez off in front of the apartment building, the defendant parked the car, went into the lobby of the building, and waited for Rodriguez. On the radio advice that the sale was complete, an officer arrested the defendant in the lobby.

1. Motion to suppress. At the time of his arrest, the defendant was asked his name and responded, falsely, "George Lassu." The officer responded that he knew that the defendant was lying. The defendant contends that his response should have been suppressed, as he had not been given Miranda warnings before he was asked his name.

The request for an arrestee's name generally does not require a Miranda warning because it "fall[s] within a 'routine booking question' exception which exempts from Miranda's coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.'" Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990). The "routine booking question" exception does not extend, however, to questions designed to elicit an inculpatory response. See Commonwealth v. Woods, 419 Mass. 366, 373 (1995), citing Muniz, 496 U.S. at 602 n.14. See also Commonwealth v. Sheriff, 425 Mass. 186, 199 (1997) (ordering hearing incident to new trial to assess whether questions asked for purpose of ascertaining whether defendant could understand Miranda warnings were designed to elicit incriminating response).

The defendant argues that, because the police knew he had given a false name on a previous occasion, they may well have intended to elicit a false response on the occasion of his arrest. However, the evidence does not support that contention. The officer testified that he recognized the defendant from a past encounter, and recalled that the defendant had given a false name in that previous encounter. The officer also testified that he could not remember the defendant's name at the time he asked the question. Standing alone, the fact that the questioning officer knew that the defendant had given a false name once before does not support a conclusion that the officer expected him

to do so again, and asked the defendant his name for the purpose of using the false name to incriminate him. Cf. Commonwealth v. Torres, 424 Mass. 792, 798 (1997) ("the mere fact that a police officer may be aware that there is a 'possibility' that a suspect may make an incriminating statement is insufficient to establish the functional equivalent of interrogation"), quoting from United States v. Taylor, 985 F.2d 3, 18 (1st Cir.), cert. denied, 508 U.S. 944 (1993). A defendant's false response to a routine request for his name on one occasion does not immunize him from similar requests on future occasions.

Moreover, unlike the circumstances present in Sheriff, supra (questions designed to test defendant's mental acuity where defendant asserted insanity defense at trial), Woods, supra (questions about employment asked on drug arrest), and Muniz, supra (defendant unable to give date of his sixth birthday, suggesting mental impairment at time of his arrest for driving while intoxicated), the defendant's response of a false name in the instant case is not directly linked to the charged offense.(1) Cf. United States v. Reyes, 225 F.3d 71, 77 (1st Cir. 2000). We find no error in the motion judge's denial of the motion to suppress.

2. Admission of business cards and health club receipt. At the time of his arrest, police seized the defendant's wallet, which contained several business cards purporting to have issued from businesses in New York, along with a receipt (issued in favor of "George Lassu") from a health club listing a New York address. The defendant's trial counsel objected on hearsay grounds to the admission of both the business cards and the receipt, but was overruled.(2)

Because they were offered to support the defendant's connection to New York based on the truth of the assertion that the businesses are located at the New York addresses listed thereon (or at the least in New York), the business cards should have been excluded as hearsay. The cases cited by the Commonwealth to support admission of the business cards are distinguishable, as the evidence in those cases was used to establish circumstantially a connection between the defendant and another person, rather than on the truth of any statement. See Commonwealth v. Soares, 384 Mass. 149, 161-162 (1981) (Western Union receipts and telephone records admissible to show relationship between conspirators, but not the transactions recorded thereon); Commonwealth v. Cohen, 6 Mass. App. Ct. 653, 660 (1978) (correspondence addressed to "Tina Cohen" and seized at defendant's home admissible to show relationship between defendant and "Tina Cohen"). In Commonwealth v. Gonzalez, 23 Mass. App. Ct. 990, 991 (1987), an envelope addressed to the defendant was held admissible to show that the defendant had some connection with that address, but not to establish that the address was the defendant's exclusive address; the connection between the defendant and the address derived from the fact that the defendant's name appeared with the address on the envelope without regard to the truth or accuracy of the address itself.

For the same reasons, though the health club receipt was admissible for the limited purpose of establishing that the defendant held himself out to be "George Lassu," see, e.g., Commonwealth v. Koney, 421 Mass. 295, 303 (1995), the New York address listed on the receipt was hearsay.(3)

Having concluded that the business cards should not have been admitted, we consider whether the error requires reversal. See Commonwealth v. Rosario, 430 Mass. 505, 511 (1999). As noted above (see note 2, supra), the business cards and health club receipt were admitted for the purpose of bolstering Rodriguez's credibility. However, there was a significant body of other evidence corroborative of Rodriguez's credibility, on matters more central to the elements of the charged offense. Because the hearsay evidence went to a collateral issue and was cumulative of other evidence submitted on that issue, we conclude that its admission was not prejudicial error. See Commonwealth v. Vinnie, 428 Mass. 161, 172, 173 (1998).

Rodriguez testified that, to arrange a drug sale, he would page the defendant and the defendant would page him back. The two would then meet at the home of a mutual friend in the Chicopee area, where the defendant would deliver the drugs to Rodriguez for sale. If Rodriguez did not have the money to pay for the drugs delivered by the defendant, the defendant would allow Rodriguez to pay him from the proceeds of the sale itself, after collecting the money from the purchaser. This account was corroborated independently as follows. At the time of their respective arrests, both Rodriguez and the defendant had pagers in their possession. In addition, the interval between the time when the undercover officer and Rodriguez arranged the sale and when the sample was delivered on the following day was consistent with a supplier's travel to Springfield from New York. After transacting the sale, Rodriguez divided the proceeds into two portions, placing $2,000 into his wallet (presumably his share) and $8,000 into his pocket (presumably for delivery to his supplier).

Most significantly, as it relates to his credibility, Rodriguez's identification of the defendant as his supplier was corroborated by two prior consistent statements made before he agreed to cooperate with the prosecution by testifying against the defendant.(4) First, before Rodriguez was aware he was under surveillance, and in response to inquiry by the undercover officer at the time Rodriguez delivered the sample, Rodriguez explained the defendant's presence at the delivery by describing him as his "main man." Rodriguez also identified the defendant as his supplier, and provided other details of their arrangement, generally consistent with his trial testimony, in his initial statement given to police following his arrest but before his agreement to cooperate. Though it was perhaps imprudent for the Commonwealth to risk reversal by the presentation of hearsay evidence on an issue so attenuated from the question of the defendant's guilt, we conclude in the circumstances that the error was not prejudicial. See Commonwealth v. Gonzalez, 23 Mass. App. Ct. at 991.

3. Other matters. The defendant's remaining arguments may be disposed of with dispatch. The defendant directs his objection to the prosecutor's reference, in his closing, to New York as the source of the drugs in this case. Based on Rodriguez's testimony, such a suggestion was a fair inference from the evidence. Moreover, for much the same reasons as discussed in the preceding section, the establishment of a "New York connection" was largely collateral to the question of the defendant's guilt. The suggestion that the evidence was sufficient merely to establish criminal liability as a principal and not as a joint venturer is without merit. See Commonwealth v. Sanchez, 40 Mass. App. Ct. 411, 418-419 (1996) (joint venture appropriate where participants act together toward a common end and where it is unnecessary "to decide who was a principal and who a helper -- for each is guilty whether acting in one or the other role or

successively in both"). Finally, no specific unanimity instruction was warranted since, on the evidence, there was but a single transaction for the sale of illegal drugs, beginning with the delivery of drugs by the defendant to Rodriguez and concluding with the consummation of the sale by Rodriguez to the undercover officer. See Commonwealth v. Thatch, 39 Mass. App. Ct. 904, 905 (1995); Commonwealth v. Zane Z., 51 Mass. App. Ct. 135, 138-139 (2001).

Judgment affirmed.

Order denying motion for new trial affirmed.

**Footnotes**

(1) The inculpatory aspect of the defendant's response was, of course, its possible use as evidence of consciousness of guilt. We note that the defendant expressly withdrew, for tactical reasons, his request for an instruction on consciousness of guilt, and successfully opposed the Commonwealth's request for such an instruction.

(2) The primary evidence of the defendant's guilt came in the form of testimony by the cooperating witness, Rodriguez. Rodriguez testified that the defendant was from New York, and the business cards and receipt tended to corroborate Rodriguez's account in that regard, thereby bolstering his overall credibility.

(3) We note that defense counsel did not request, and the trial judge did not give, a limiting instruction at the time the health club receipt was admitted in evidence.

(4) The prior consistent statements were admitted in evidence in response to the defendant's attempt, during cross-examination of Rodriguez, to impeach Rodriguez's credibility by reference to his agreement to cooperate with the prosecution in exchange for favorable sentencing.