# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
JOSE RAMIREZ,                          )
                                       )
        Petitioner,                    )
                                       )
    v.                                 )        Civil Action No.
                                       )        03-40281-FDS
JAMES SABA,                            )
                                       )
        Respondent.                    )
_____)

## <u>MEMORANDUM AND ORDER</u>

**SAYLOR, J.**

      This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent

James Saba is the Superintendent of the North Central Correctional Institution ("NCCI") in

Gardner, Massachusetts.[1]  Petitioner Jose Ramirez was convicted in Massachusetts state court of

trafficking in cocaine as a joint venturer and is currently serving a fifteen-year sentence in state

custody at NCCI.  He alleges that this conviction was obtained in violation of his Fifth

Amendment privilege against self-incrimination.[2]  For the reasons set forth below, the petition

will be denied.

---

      [1] Pursuant to Fed. R. Civ. P. 25(d), the Court substitutes James Saba for Steven J. O'Brien.

      [2] Ramirez's petition originally raised an additional ground for habeas relief—that his conviction was obtained in violation of his Sixth Amendment right to be confronted with the witnesses against him.  (Doc. No. 6 at 5).  In his memorandum of law filed in support the habeas petition, however, Ramirez addresses only his Fifth Amendment claim.  (Pet'r Mem. at 1).  Accordingly, he has waived any contention that his state conviction was obtained in violation of the Sixth Amendment.  *See Fortini v. Murphy*, 257 F.3d 39, 45 (1st Cir. 2001) (finding wavier when argument was not raised in briefing or oral argument).

I.    **Background**

On May 14, 1998, undercover police officers arranged to purchase cocaine from Daniel Rodriguez.  At approximately 3:50 p.m., undercover officer Alan Fisher met Rodriguez at an apartment in order to examine a sample of the drugs.[3]  Rodriguez arrived at the apartment in a car driven by Ramirez.  Rodriguez exited the vehicle and went upstairs while Ramirez parked the car.  After parking the car, Ramirez went into the building's lobby to wait for Rodriguez.  Detective Lieutenant William Jebb, who was overseeing the sting operation from an undercover vehicle, observed Ramirez as he entered the building and recognized him from a narcotics arrest some years earlier.

Rodriguez and Fisher met in Fisher's apartment.  Fisher examined the drugs and told Rodriguez that he would contact him later in the day to arrange the final purchase.  Rodriguez exited the apartment, met Ramirez in the lobby, and the two left the building together.

Later that evening, Rodriguez and Ramirez returned to the apartment building.  Once again, Rodriguez went into Fisher's apartment while Ramirez stayed in the lobby.  In the apartment, Fisher gave $10,000 to Rodriguez, who provided eleven ounces of cocaine in exchange.  Rodriguez placed $2,000 in his own wallet and put $8,000 in his pocket and left the apartment.  At that point, Fisher communicated to the other officers that the transaction was complete.  Rodriguez was arrested in the apartment corridor and taken downstairs in the elevator.

Upon hearing that the drug sale had been consummated, Jebb ran to the lobby where Ramirez was waiting and placed him under arrest.  At almost the same time, the elevator carrying Rodriguez arrived in the lobby.  Sergeant Lonny Dakin, who was riding in the elevator,

---

[3] The record occasionally uses the spelling "Allen."

went to assist Jebb.  Dakin immediately recognized Ramirez from the prior narcotics violation.

He also remembered that Ramirez had previously used a false name.  Before advising Ramirez of

his *Miranda* rights, Dakin asked Ramirez for his name.  Ramirez responded, falsely, "George

Lassu."[4]  Although Dakin could not remember Ramirez's actual name at the time, Dakin knew it

was not George Lassu.[5]  The officers then transported Ramirez to the police station.  He was

subsequently charged with trafficking in 200 grams or more of cocaine.

Ramirez moved to suppress his statement, arguing that because Dakin was aware he had

---

[4] The record occasionally uses the spelling "Laso."

[5] The record on this point is somewhat unclear.  At the suppression hearing, Dakin testified as follows:

Q.   And after [Ramirez] gave you – you asked him his name, he gave you the name of
     George [Lassu], did you question him any further at that time?
A.   I told him that I knew he was lying and that *I did know his name*, it was on the tip of my
     tongue, *and it did come back to me*.  But I did not talk to him much further, no.

(Suppression Hearing Tr. at 56 (emphases added)).  At trial, however, Dakin testified:

A.   I asked – I recognized [Ramirez] *but I did not know his name*.  I asked him his name, and
     he gave me George Lassu as his name.
Q.   And what did you do when he told you his name was George Lassu?
A.   I told him he was lying.  I knew that wasn't his name.
Q.   *At some point* did you remember or determine what his name was?
A.   Yes.
Q.   And what did you remember his name to be?
A.   Jose Ramirez.

(R. Vol. 2 at 118 (emphases added)).  In affirming Ramirez's conviction, the Massachusetts Appeals Court found
that Dakin did not know Ramirez's name at the time Ramirez gave his statement.  *Commonwealth v. Ramirez
("Ramirez I")*, 55 Mass. App. Ct. 224, 226 (2002) ("The officer also testified that he could not remember the
defendant's name at the time he asked the question.").

A state court's finding on a factual issue "shall be presumed to be correct," and the petitioner bears the
burden of disproving factual findings by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1);  *see Norton v.
Spencer*, 351 F.3d 1, 6 (1st Cir. 2003).  The "presumption of correctness is equally applicable when a state appellate
court, as opposed to a state trial court, makes the finding of fact."  *Norton*, 351 F.3d at 6 (quotation omitted).

Ramirez argues, without invoking § 2254(e)(1), that Dakin knew Ramirez's name at the time of the
statement.  Assuming that Ramirez intends to challenge the factual determination of the Massachusetts Appeals
Court that Dakin was unaware of Ramirez's true name, he has not shown by clear and convincing evidence that the
state court's finding was incorrect.  Accordingly, the Court will adhere to that finding.

previously provided a false name, a reasonable officer should have recognized that asking for his

name would likely elicit an incriminating response.  The trial judge denied the motion,

concluding that

> [o]ne does not have to be given their rights by the police before the police ask
> their name.  That is [bedrock] law.  Giving your name does not call for any
> *Miranda* warnings. . . . It is an administerial action by the police in identifying the
> individual they were dealing with at the point of detention.
>
> . . . The[ police] had a right to ask [Ramirez] his name without giving him his
> rights.  The fact he gave a false name may well be used at trial as consciousness
> of guilt.  I don't know[;] that will be up to the trial judge to deal with, but it is not
> suppressible nor should it be suppressed in any way.

(Suppression Hearing Tr. at 67-68).  During trial, at defense counsel's request and over an

objection by the prosecution, the judge declined to give a "consciousness of guilt" instruction.[6]

Even so, the government referred to Ramirez's use of the name "George Lassu" in both its

opening statement and closing argument.

     Ramirez was ultimately convicted.  He was sentenced to a minimum term of

imprisonment of fifteen years and a maximum term of fifteen years and one day.

     Ramirez appealed his conviction to the Massachusetts Appeals Court, arguing, among

other things, that the admission of his false statement contravened the Fifth Amendment because

he had not been advised of his *Miranda* rights prior to making the statement.  The court rejected

his argument and affirmed his conviction.  *Ramirez I*, 55 Mass. App. at 226-27.  The court

---

[6] Defense counsel argued that because Ramirez had immigration problems, he used a false name to avoid detection, not to hide his connection with Rodriguez and the drug sale.  The trial judge apparently agreed. According to the trial judge, it would not be reasonable for the jury to infer that Ramirez's use of a false name evidenced his guilt of the drug trafficking charge.  At the time of his arrest, Ramirez was in possession of documents demonstrating that the identity of George Lassu had been created sometime before the drug transaction.  Because it was not "a recent fabrication," the trial judge concluded that Ramirez's use of a false name shed little light on his connection with Rodriguez and the drug sale.  (R. Vol. 3 at 91).

reasoned that the evidence did not support "a conclusion that the officer expected [Ramirez] to [provide a false name] again, and asked [Ramirez] his name for the purpose of using the false name to incriminate him." *Id.* at 226.  The court also concluded that because Ramirez's use of a false name was not directly linked to the drug trafficking charge, it was doubtful that a reasonable officer would have expected it to elicit an incriminating response. *Id.* at 227. Ramirez then filed an application for leave to obtain further appellate review, which the Supreme Judicial Court denied. *Commonwealth v. Ramirez ("Ramirez II")*, 437 Mass. 1108 (2002) (table).  Ramirez did not file a petition for a writ of certiorari with the United States Supreme Court.

Ramirez next sought a new trial by filing a motion in the Superior Court.  That motion was denied.  The Appeals Court affirmed the denial. *Commonwealth v. Ramirez ("Ramirez III")*, 67 Mass. App. Ct. 1120 (2006) (unpublished).  The Supreme Judicial Court then denied further review. *Commonwealth v. Ramirez ("Ramirez IV")*, 448 Mass. 1104 (2007) (table).

## II.   Analysis

A federal court may not issue a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Petitioner seeks relief under both clauses of § 2254(d)(1).  He does not invoke § 2254(d)(2).

A state-court decision is "contrary to" clearly established Federal law "if the state court

applies a rule that contradicts the governing law set forth" by the Supreme Court.  *Williams v.*

*Taylor*, 529 U.S. 362, 405 (2000).  "A state-court decision will also be contrary to [the] Court's

clearly established precedent if the state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from

[the Court's] precedent."  *Id.* at 406.

An "unreasonable application of Supreme Court case law occurs if the state court

identifies the correct governing legal principle for th[e] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case."  *Jackson v. Coalter*, 337 F.3d 74, 81

(1st Cir. 2003) (quotation omitted; alteration in original).  The "unreasonable application"

determination

> must be decided primarily on the basis of Supreme Court holdings that were
> clearly established at the time of the state court proceedings.  Nevertheless,
> factually similar cases from the lower federal courts may inform such a
> determination, providing a valuable reference point when the relevant Supreme
> Court rule is broad and applies to a kaleidoscopic array of fact patterns.

*Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002) (citation omitted).

An unreasonable state court decision is not the equivalent of an incorrect decision.  *See*

*Williams*, 529 U.S. at 389; *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) ("[T]he mere

fact that there was some error or that the state decision was incorrect is not enough.").  "[I]f it is

a close question whether the state decision is in error, then the state decision cannot be an

unreasonable application. . . .  [S]ome increment of incorrectness beyond error is required."

*McCambridge*, 303 F.3d at 36 (quotation omitted).  "In the end, a state court decision is

objectively unreasonable under [§ 2254(d)(1)] only if it is so offensive to existing precedent, so

devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible,

credible outcomes." *Kibbe v. DuBois*, 269 F.3d 26, 36 (1st Cir. 2001) (quotation omitted).

A.      **Fifth Amendment Claim**

The Fifth Amendment guarantees that no "person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V.  Pursuant to that guarantee, a suspect must be advised of his *Miranda* rights prior to a custodial interrogation.  *Dickerson v. United States*, 530 U.S. 428, 438 (2000); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).[7] Thus, apart from interrogation in the formal sense, *Miranda* warnings are necessary whenever the police employ "words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.* at 301 (footnote omitted).  An incriminating response is one that the prosecution may seek to use at trial.  *Id.* n.5.

In *Pennsylvania v. Muniz*, a four-justice plurality recognized an exception to *Miranda*, under which officers need not advise suspects of their rights before asking routine booking questions.  496 U.S. 582, 600-02 (1990) (plurality opinion).[8]  The "routine booking" exception

---

[7] There is no question that petitioner was in custody at the time of his statement.  The only disputed issue is whether, for *Miranda* purposes, asking for petitioner's name constituted interrogation.

[8] In *Muniz*, the defendant was charged with driving under the influence of alcohol.  496 U.S. at 587.  Four justices concluded that, pursuant to the booking exception, *Miranda* warnings were not required before officers asked the defendant his name, address, height, weight, eye color, date of birth, and current age.  *Id.* at 600-02 (plurality opinion).  The questions sought "biographical data necessary to complete booking or pretrial services," and there was no indication that, given the sensibilities of the defendant and the circumstances surrounding the arrest, the questions were designed to elicit incriminating admissions.  *Id.* at 601-02 & n.14.  By contrast, five justices concluded that asking the defendant for the date of his sixth birthday required *Miranda* warnings because the incriminating nature of his response depended upon the content of the answer.  *Id.* at 598-99.  Such a question did not seek routine, biographical data.  *See id.* at 601 (plurality opinion).

has been adopted by the First Circuit, and accordingly the requirements of *Miranda* do not apply to questions of an administrative nature, such as those seeking a suspect's name, address, and related matters. *United States v. Reyes*, 225 F.3d 71, 76-77 (1st Cir. 2000) (concluding that questions seeking defendant's name, date of birth, and social security number, fell within routine booking exception); *see United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1989) (assuming without deciding that there existed a routine booking exception to *Miranda*).  The exception does not apply, however, when "the questions and circumstances [a]re such that the officer should reasonably have expected the question to elicit an incriminating response." *Reyes*, 225 F.3d at 77; *see Muniz*, 496 U.S. at 602 n.14.  "The question is an objective one; the officer's *actual* belief or intent is relevant, but it is not conclusive." *Doe*, 878 F.2d at 1551.

Petitioner contends that he was denied his Fifth Amendment rights when Officer Dakin asked him his name prior to advising him of his *Miranda* warnings.  Specifically, petitioner argues that because Dakin knew that he had given a false name on a prior occasion, he must have known petitioner would do so again on this occasion, thereby incriminating himself.  When petitioner did provide a false name, the prosecution used that fact against him at trial as evidence of his consciousness of guilt.  Petitioner contends that the state court's rejection of this argument was both contrary to, and an unreasonable application of, clearly established federal law.  *See* § 2254(d)(1).  The Court disagrees.

The decision of the Massachusetts Appeals Court was not contrary to clearly established law.  *See id.*  In affirming petitioner's conviction, the court identified the correct legal standard, *see Ramirez I*, 55 Mass. App. Ct. at 226-27 (citing *Muniz*, 496 U.S. at 601-02 & n.14), and applied that rule to the facts of petitioner's case.  And petitioner has not pointed to any case

presenting facts materially indistinguishable from his case that compel a result different from that reached by the Massachusetts Appeals Court.[9]

Nor was the decision of the Massachusetts Appeals Court an unreasonable application of clearly established federal law.  *See* § 2254(d)(1).  In light of the factual finding that Dakin was unaware of petitioner's actual name at the time, the record provides ample support for the conclusion that Dakin's question was not likely to elicit an incriminating response.  It is certainly possible that a reasonable officer, knowing that petitioner had previously used a false name, would recognize the possibility that the petitioner would incriminate himself.  Yet something more than a mere possibility is required.  *See United States v. Taylor*, 985 F.2d 3, 8 (1st Cir. 1993) ("[T]he mere fact that a police officer may be aware that there is a 'possibility' that a suspect may make an incriminating statement is insufficient to establish the functional equivalent of interrogation." (quoting *Arizona v. Mauro*, 481 U.S. 520, 528-29 (1987)).

Moreover, because petitioner's use of a false name was not directly related to the offense for which he was arrested and charged—drug trafficking—it is unlikely that a reasonable officer would have understood that the question would likely elicit inculpatory information.  *See Reyes*, 225 F.3d at 77.  This is not a situation in which a defendant is arrested for impersonating a law enforcement officer or a comparable crime.  *Id.*  In such a case, "asking a person's name might reasonably be expected to elicit an incriminating response."  *Id.*

---

[9] The cases cited by petitioner are distinguishable.  (*See* Pet'r Mem. at 13-14).  To take but one example, in *United States v. Doe*, Coast Guard officers asked the defendants questions about their citizenship.  The defendants were captured on the high seas, after setting fire to a foreign vessel with drugs on board.  878 F.2d at 1551.  Those questions were reasonably likely to elicit an incriminating response because it is not immediately obvious "whether[] the United States can prosecute a person found on such a ship. . .; and the possibility that prosecution will turn upon citizenship is great enough (and should be well enough known to those in the drug enforcement world) that Coast Guard officers ought to know that answers to such questions may incriminate."  *Id.* at 1551-52.

9

Petitioner is correct that providing a false name is potentially incriminating no matter what the underlying charge.[10]  But that is not enough to require *Miranda* warnings prior to asking a suspect for his name.  Were that the rule, petitioner would forever be immunized from a request for his name merely because he provided a false name on a prior occasion.  "[W]e cannot ask the[ police] to therefore forego all routine procedures and detain an individual without knowing anything about him."  *Id.*[11]

In summary, the decision of the Massachusetts Appeals Court was neither contrary to, nor an unreasonable application of, clearly established federal law.  *See* § 2254(d)(1).  The petition for a writ of habeas corpus will therefore be denied.

III.   **Conclusion**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**                                    /s/ F. Dennis Saylor
                                                   F. Dennis Saylor IV
                                                   United States District Judge

Dated:  October 28, 2009

---

[10]  As noted, an incriminating response is one that the prosecution may seek to use at trial.  *Innis*, 446 U.S. at 301 n.5.  Given the conclusion that a reasonable officer would not have known that petitioner would provide a false name, the Court need not decide to what extent the state trial judge's refusal to give a "consciousness of guilt" instruction affects whether petitioner's response to Dakin's question was "incriminating."

[11]  Petitioner also argues that because his statement was made at the time of his arrest (as opposed to at the police station), it does not fall within the routine booking exception.  (Pet'r Mem. at 12).  In support, he cites a decision of the Wisconsin Supreme Court, *State v. Stevens*, 511 N.W.2d 591, 599 (Wis. 1994), *overruled on other grounds by Richards v. Wisconsin*, 520 U.S. 385 (1997).  The Court disagrees.  As already described, because Dakin did not know petitioner's actual name, the Massachusetts Appeals Court reasonably concluded that the question did not constitute interrogation. It is therefore immaterial that Dakin asked the question at the time of arrest rather than at the police station.

In any event, Dakin's question did not constitute interrogation merely because it occurred during petitioner's arrest.  In this respect, the Court agrees with the decision of the Eighth Circuit in *United States v. Brown*, 101 F.3d 1272, 1274-75 (8th Cir. 1996).  There, Brown provided a false name in response to a question asked during his arrest on drug-related charges.  The routine booking exception applied, as it does here, because "[Brown's] name was not directly relevant to the substantive offense charged [and] . . . [i]f Brown had merely provided his true name, the information would not have been incriminating."  *Id.* at 1274.